**WOORI BANK, Plaintiff,**

v.

**MERRILL LYNCH, et al., Defendants.**

**No. 12 Civ. 3993 (VM).**

United States District Court,
S.D. New York.

Feb. 6, 2013.

---

Seth Rich Gassman, Kristen Ward Broz, Michael D. Hausfeld, Nathaniel C. Giddings, Timothy S. Kearns, William P. Butterfield, Hausfeld LLP, Washington, DC, Christopher L. Lebsock, Michael P. Lehmann, Hausfeld LLP, San Francisco, CA, Hojin Seo, Deryook USA, New York, NY, for Plaintiff. Adam Selim Hakki, John Gueli, Shearman & Sterling LLP, David B. Hennes, Stephanie J. Goldstein, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for Defendants.

Adam Selim Hakki, John Gueli, Shearman & Sterling LLP, David B. Hennes, Stephanie J. Goldstein, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Woori Bank ("Woori") filed the complaint in this action on May 18, 2012 asserting common law claims for fraud, rescission, negligent misrepresentation, and unjust enrichment (the "Complaint") arising out of its $143 million investment in seven collateralized debt-obligations ("CDOs"). By letter dated September 20, 2012, Merrill Lynch & Co., Inc., Merrill Lynch International, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., and Bank of America Corporation (collectively "Merrill Lynch") asserted that Plaintiff's action should be dismissed based on the applicable statute of limitations. Woori responded on October 3, 2012 and Merrill Lynch submitted its reply on October 18, 2012.[1] The Court deems Merrill Lynch's submission as constituting a motion to dismiss the Complaint. For the reasons discussed below, Merrill Lynch's motion to dismiss is

---

**1.** By letter dated October 18, 2012, defendants Taberna Preferred Funding II, Inc. and Taberna Preferred Funding VI, Inc. (the "Taberna Entities") joined in Merrill Lynch's October 18, 2012 reply submission.

GRANTED, and Woori's Complaint is DISMISSED.

## I. BACKGROUND

Woori brings this action against Merrill Lynch; Centre Square CDO, LLC; IMAC CDO 2006–1, LLC; Istana High Grade ABS CDO I, LLC; Libertas Preferred Funding I, LLC; Mantoloking CDO 2006–1, LLC; Taberna Preferred Funding II, Inc.; and Taberna Preferred Funding VI, Inc.[2] (collectively, "Defendants") alleging that Defendants made false and misleading misrepresentations and omissions that induced Woori to invest $143 million in a number of CDOs. Specifically, Woori claims that Defendants misrepresented the riskiness of these investments by concealing inside information relating to the quality of the underlying mortgages and the credit ratings assigned to these CDOs.

From 2005 to 2006, Woori purchased interests from Merrill Lynch in the following seven CDOs: (1) Taberna Preferred Funding II; (2) Libertas; (3) Taberna Preferred Funding VI; (4) IMAC; (5) Istana; (6) Centre Square; and (7) Mantoloking. According to Woori, Merrill Lynch "acquired and supplied the assets underlying the CDOs, established the issuers, arranged for Moody's and/or Standard and Poor to supply ratings for the CDOs, and then marketed and sold the CDOs to Woori and other investors." Compl. ¶ 6. On January 30, 2009, Woori sold its interest in all of the CDOs except Taberna Preferred Funding II and Taberna Preferred Funding VI, which it continues to hold.

During 2006 and 2007, the United States residential real estate market suffered a massive decline that paralyzed credit markets and sent Shockwaves through the entire financial system. Much has been written detailing the causes of the resulting financial crisis; the Court will not attempt to replicate those efforts here. However, suffice it to say that two major factors widely attributed as being responsible for the crisis were the failure of many financial institutions to adhere to mortgage-lending standards—a problem that was exacerbated by the packaging and securitization of residential mortgages—and the failure of the credit-rating agencies to report the underlying risks posed by securities structured with these mortgages as underlying assets.

Merrill Lynch's role at the center of the financial crisis has also been widely reported in the media as well as its being the subject of multiple lawsuits and regulatory investigations. According to some of these reports and court filings, serious problems existed with Merrill Lynch's securitization practices. Between late 2007 and May 18, 2009, Merrill Lynch was the target of multiple lawsuits alleging that the firm misrepresented mortgage underwriting standards, significantly understating the risk of various investments.

## II. DISCUSSION

Merrill Lynch argues that Woori's claims are time-barred because Woori was on notice and had the practical ability to bring the current action prior to May 18, 2009. Specifically, Merrill Lynch cites a multitude of pre-May 18, 2009 press reports, government investigations, and private lawsuits that contain substantially similar allegations as the current Complaint. Woori disagrees, claiming that de-

---

2. On August 8, 2012, the Court granted Woori's motion to dismiss without prejudice the following parties: Centre Square CDO, Ltd.; Istana High Grade ABS CDO I, Ltd.; IMAC CDO 2006–1, Ltd.; Libertas Preferred Funding I, Ltd.; Mantoloking CDO 2006–1, Ltd.; Taberna Preferred Funding II, Ltd.; and Taberna Preferred Funding VI, Ltd. (Docket No. 35).

spite the many reams dedicated to exposing Merrill Lynch's role in the financial crisis—including sources cited in Woori's Complaint and legal actions alleging substantially similar claims to those detailed in the Complaint—it did not have the practical ability to bring its current claims, and therefore the statute of limitations did not begin to run, until January 27, 2011 when the Financial Crisis Inquiry Commission ("FCIC") provided its official censure of Merrill Lynch's mortgage-related activities through the publication of its report detailing the causes of the financial crisis. *See* Financial Crisis Inquiry Commission, Final Report of the Nat'l Comm'n on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report"), available at http://fcic.law.stanford.edu/report. For the reasons stated below, the Court finds that Woori's claims are time-barred.

## A. *LEGAL STANDARD*

Defenses based on statutes of limitations are properly brought under Federal Rule of Civil Procedure 12(b)(6) as motions to dismiss for failure to state a claim. *See Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir.1989). In considering a motion to dismiss pursuant to Rule 12(b)(6), a court construes the complaint broadly, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). However, mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (quotation marks and citation omitted). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

## B. *CHOICE OF LAW*

■ Where a cause of action accrues outside of New York to a non-New York resident, New York's choice of law borrowing statute applies to determine the appropriate statute of limitations. N.Y. C.P.L.R. § 202 (McKinney 2011); *see, e.g., In re Coudert Bros. LLP*, 673 F.3d 180, 190 (2d Cir.2012); *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir.1998). Under the borrowing statute, a plaintiff's claim is not barred if it is timely under both the statute of limitations of New York and of the jurisdiction in which the cause of action accrued. *See Antone v. Gen. Motors Corp.*, 64 N.Y.2d 20, 484 N.Y.S.2d 514, 473 N.E.2d 742 (1984). Here, in order to determine the location where Woori's cause of action accrued, the Court must first determine (1) the residency of Woori and (2) the location of the injury. Because Woori is both a resident of and suffered injury in Korea, the Court concludes that Woori's cause of action accrued in Korea.

### 1. *Woori Is a Resident of Korea*

Courts within the Second Circuit have consistently held that a business entity's residence is determined by its principal place of business. *See, e.g., Guzman v. Macy's Retail Holdings, Inc.*, No. 09 Civ. 4472, 2010 WL 1222044, at *10 (S.D.N.Y. Mar. 29, 2010) ("A corporation's principal place of business ... determines its residence.") (internal citations omitted); *Pereira v. Cogan*, No. 00 Civ. 619, 2001 WL 243537, at *18 (S.D.N.Y. Mar. 8, 2001) ("District courts in this circuit applying New York law have held that the residence of a corporation for purposes of New York's borrowing statute is the corporation's principal place of business.") (*citing*

*National Union Fire Ins. Co. of Pittsburgh, PA v. Forman 635 Joint Venture,* No. 94 Civ. 1312, 1996 WL 507317, at *4 (S.D.N.Y. Sept. 6, 1996); *McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 727 F.Supp. 833, 834 (S.D.N.Y.1989) ("[A] partnership's sole legal residence under [the New York borrowing statute] is where it maintains its principal place of business.") (internal quotation marks omitted); *see also Proforma Partners, LP v. Skadden Arps Slate Meagher & Flom, LLP,* 280 A.D.2d 303, 720 N.Y.S.2d 139 (1st Dep't 2001).

 Under the New York borrowing statute, a business's principal place of business constitutes the sole residency of that business entity. *Robb Evans & Assocs. L.L.C. v. Sun Am. Life Ins.,* No. 10 Civ. 5999, 2012 WL 488257, at *3 (S.D.N.Y. Feb. 14, 2012). Therefore, regardless of whether Woori has a significant connection to New York—which it has openly stated it does not in other proceedings, see Defs.' Reply Ex. 5 at 12; *id.* Ex. 6 at 7—Woori is still a resident of Korea, where it maintains its principal place of business, *not* New York. *Id.*

### 2. *Woori's Cause of Action Accrued in Korea*

 According to the New York borrowing statute, a "cause of action accrues where the injury is sustained rather than where the defendant committed the wrongful acts." *Gordon & Co. v. Ross,* 63 F.Supp.2d 405, 408 (S.D.N.Y.1999) (*citing Global Fin. Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999)). "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Fin. Corp.,* 693 N.Y.S.2d 479, 715 N.E.2d at 485. Because Woori is a resident of Korea and any injury is wholly economic, the Court finds that Woori's cause of action accrued in Korea.

### C. *STATUTE OF LIMITATIONS*

Because Woori is a non-resident under the New York borrowing statute, the shorter of the Korean and New York statutes of limitations period applies to Woori's claims. *See* C.P.L.R. § 202. The New York statute of limitations provides that an action based upon fraud must be commenced either six years from accrual or two years from when a reasonably diligent plaintiff could have discovered the fraud—whichever is greater. *Id.* § 213(8). The parties do not dispute that the relevant Korean statute of limitations is three years. *See* Minbeom [Civil Act], Act No. 471, Feb. 22, 1958, art. 766(1) (S. Kor.); Defs.' Mot. 2; Pl.'s Resp. 3. Because the Korean statute of limitations is shorter, this Court will apply it to Woori's claims.

Under Korean law, the three-year statute of limitations begins to run "from the date on which the injured party or his agent by law becomes aware of such damage and of the identity of the person who caused it." Minbeom [Civil Act], Act No.471, Feb. 22, 1958, art. 766(1) (S. Kor.); Pl.'s Resp. 3. Merrill Lynch claims that this analysis is identical to New York's inquiry notice standard. Defs.' Mot. 4–5. Woori disagrees, claiming the statute of limitations begins to run when a plaintiff could "practically" file a claim, "taking into account the totality of the objective evidence." Pl.'s Resp. 3. The Court concludes that, under either standard, Woori's claims are time-barred.

### 1. *Woori Was on Notice and Had the Practical Ability to Bring a Claim Prior to May 18, 2009*

Woori simultaneously claims that the generalized evidence cited as the basis of its complaint—the vast majority of which involves factual allegations published prior

to May 18, 2009—is sufficiently detailed to state a cognizable claim for relief and that, nevertheless, these facts were somehow insufficiently particular to cause the statute of limitations to run. Specifically, Woori claims that it was not on notice of Merrill Lynch's alleged impropriety until the publication of the FCIC Report on January 27, 2011 because prior to that point it was unable to "practically" file a claim. Pl.'s Resp. 5. The Court disagrees.

### a. The Majority of Evidence Cited by Woori Was Available Prior to May 2009

Woori's complaint clearly displays that the vast majority of the substantive allegations and supporting evidence it relies upon were available long before May 18, 2009. Starting in early 2007, reports began to emerge regarding the allegations in Woori's complaint that certain mortgages packaged by Merrill Lynch did not meet underwriting standards and that the credit ratings of certain CDOs sold by Merrill Lynch were unreliable.[3] In fact, Woori itself acknowledges that the October 2007 "wide-spread write down of CDO ratings"—including the write down of specific CDO interests at issue here—began to expose the allegedly "corrupt system of CDO ratings to Plaintiff." Compl. ¶¶ 94–95; cf. Federal Hous. Fin. Agency v. USB Ams., Inc., 858 F.Supp.2d 306, 321 (S.D.N.Y.2012) (highlighting the importance of a ratings downgrade to the ability to bring an action in the Securities Act context). Between early 2007 and May 2009, problems with mortgage standards and CDO ratings were reported extensively by the media and served as the basis for multiple government investigations and individual lawsuits. Not only did these sources publicize general problems with mortgages issued by subprime lenders, they also exposed specific facts regarding Merrill Lynch that Woori currently employs to substantiate its fraud claims.

Following these reports of impropriety by Merrill Lynch and other financial institutions, other plaintiffs began filing numerous lawsuits incorporating these facts into their complaints. As early as October 18, 2007, an action was filed against Merrill Lynch relating to a particular securitization at issue in this case—Mantoloking—alleging, among other things, that Merrill Lynch failed to fully disclose the exposure of certain CDOs to the sub-prime mortgage market. See Complaint at ¶ 42, MetroPCS Commc'ns v. Merrill Lynch & Co., Inc., No. 07–12430 (Tex.Dist.Ct. Oct. 18, 2007); Defs.' Mot. Ex. 31. Since late 2008, many more lawsuits have been filed against Merrill Lynch specifically alleging that Merrill Lynch made misrepresentations regarding mortgage underwriting standards thereby significantly understating the risk of various investments. See, e.g., Complaint at ¶¶ 4, 8, Iron Workers Local No. 25 Pension Fund v. Credit–Based Asset Serv. & Sec. L.L.C., No. 08 Civ. 10841 (S.D.N.Y. Dec. 12, 2008) (false statements relating to underwriting stan-

---

**3.** Woori claims that every document cited by the Defendants as evidence that Woori should have been on notice "was written in English and there is no indication that any of these documents was published in Korean, or even widely-distributed in Korea." Pl.'s Resp. 5 n. 6. The Court will not presume that Woori, a subsidiary of the largest financial holdings group in Korea with over $284 billion in assets, monitors such esoteric English-language publications as The Wall Street Journal, Bloomberg, The Economist, The New York Times, or the Financial Times. Nevertheless, it is curious that a transnational financial institution as large and sophisticated as Woori managed to digest the FCIC Report—a more than 500–page one-time masterwork of the English language produced by the ever-eloquent United States Government, probably by lawyers—in such a comprehensive manner, while overlooking years of business publications regularly and explicitly covering matters directly pertinent to Woori's investments.

dards resulted in "dramatically greater risk profile" for asset-backed certificates); Complaint at ¶¶ 11–12, *Public Emp. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.,* No. 09 Civ. 1392 (S.D.N.Y. Feb. 17, 2009) (false statements about asset-backed certificates); Complaint at ¶¶ 10–15, *Wyoming State Treasurer v. Merrill Lynch & Co., Inc.,* No. 09 Civ. 3030 (S.D.N.Y. Mar. 27, 2009) (false statements about mortgage pass-through certificates); Complaint at ¶¶ 9–10, 43, *Connecticut Carpenters Pension Fund v. Merrill Lynch & Co.,* No. BC403282 (Cal.Super.Ct. Dec. 5, 2008) (false statements about mortgage certificates).

Moreover, investors also filed shareholder lawsuits against Merrill Lynch claiming the institution had also misrepresented its own exposure to CDOs and other subprime assets. *See In re Merrill Lynch & Co. Sec., Derivative and ERISA Litig.,* No. 07 Civ. 9633 (S.D.N.Y. Sept. 23, 2008).

While these lawsuits related to a variety of mortgage-related investment products, many of which were not CDOs, they nevertheless cite to substantially similar—indeed at times identical—facts as Woori's Complaint to support allegations of systemic deficiencies in both Merrill Lynch's underwriting disclosures and the ratings of these investment products provided by the rating agencies. Regardless of the specific type of financial instrument at issue, just as in the present action, all these cases make the same core allegation: that Merrill Lynch failed to disclose or misrepresented the disjunct between the alleged underwriting standards and the actual quality of the underlying mortgages. As a result, it is not surprising Woori cites many of the same factual allegations made in these pre-May 2009 lawsuits as evidence directly supporting its claims against Merrill Lynch in the present action.

For example, Woori points to Merrill Lynch's relationship with the subprime lender Ownit Mortgage Solutions, Inc. ("Ownit") as an example of Merrill Lynch encouraging subprime lenders "to generate defective and toxic loans in order to increase loan volume." Compl. ¶ 60. However, it was widely reported as early as May 2007 that Merrill Lynch had pressured Ownit to lower its underwriting standards in order to increase the volume of loans. *See, e.g.,* Pl.'s Resp. Exs. 12, 39; Compl. ¶¶ 57–58, 60, 63.

Merrill Lynch's relationship with Ownit has also been cited by numerous complaints filed since then, including a class action lawsuit filed in December 2008 claiming that, in the context of mortgage registration statements, Merrill Lynch had "misstated, *inter alia,* the process used to originate loans and the quality of mortgages" and specifically pointed to Ownit as an example of Merrill Lynch pressuring lenders to lower underwriting standards. Complaint at ¶¶ 9–10, 43, *Connecticut Carpenters Pension Fund,* No. BC4 032 82; *see also In re Merrill Lynch & Co. Inc. Sec., Derivative and ERISA Litig.,* No. 07 Civ. 9633 (S.D.N.Y. Sept. 23, 2008).

If Woori claims that this extensive publicly available information cited in its complaint supports its claims, then these public materials would also have contributed to the totality of the circumstances putting the bank on notice of possible claims. *See GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.,* 580 F.Supp.2d 321, 329 (S.D.N.Y.2008) (dismissing claim as time-barred where "numerous news articles, press releases and lawsuits appeared containing the exact allegations of wrongdoing by [defendant] that [plaintiff] now includes in its Amended Complaint."). Whether the Court looks to inquiry notice or to the time at which Woori could have "practically" brought a claim, the totality of the objective evidence demonstrates that Woori possessed all the

requisite pieces of relevant information to bring an action prior to May 18, 2009.

b. *The FCIC Report Is Not the Benchmark for Woori's Ability to Bring this Action*

■ Woori disputes that it could have practically brought the current action prior to May 18, 2009. Specifically, Woori claims that the first reasonable date from which it could "practically" file a claim was January 27, 2011, when the FCIC published a comprehensive report detailing the overall causes of the financial crisis, including, in part, Merrill Lynch's CDO activities. Woori claims the publication date of the FCIC Report is the appropriate date because litigation in Korea "frequently requires a delay . . . until regulatory authorities have published the official results of their investigations." Pl.'s Resp. 3–4. Therefore, Woori claims it could not have "practically" brought a claim until the FCIC published its over 500–page report that "carried the imprimatur of credibility from the U.S. government." Pl.'s Resp. 2. Neither the law cited by Woori nor the facts of the present case supports this proposition.

Notwithstanding Woori's assertions to the contrary, there is nothing in the Korean law cited by the parties, the law of this Court, or common sense that would require an official government determination of wrongdoing before a civil lawsuit relating to that conduct may be brought. Instead, this Court's review reveals that Korean law requires an analysis of the "totality of the objective evidence"—including press reports, government investigations, and other lawsuits—to determine when a plaintiff can be deemed to have "practical and specific awareness" of a claim. Pl.'s Resp. Ex. A ¶ 10; Defs.' Response Ex. 2 ¶ 12; *see* [Seoul District Court], 95Gadan95739, Feb. 13, 1996; [Seoul High Court], 2002B32686, Jan. 26, 2006 (dismissing claim under statute of limitations because "the statute of limitations generally starts running from the point of time when an objective right does exist and the right can be exercised. . . . Even if the victims of this case were not aware of the existence of their right . . . diseases due to defoliants did occur to the victims of this case in reality and there exists no legal barrier that may hinder the victims from exercising their right in this case.").

While a government investigation into wrongdoing may be sufficient to provide inquiry notice, it is not a necessary requirement. *See Hinds Cty., Miss. v. Wachovia Bank N.A.*, 790 F.Supp.2d 121, 123–24 (S.D.N.Y.2011) (holding that indictment was not a prerequisite to notice and dismissing claims); *de la Fuente v. DCI Telecommcn's, Inc.*, 206 F.R.D. 369, 383 (S.D.N.Y.2002) (collecting cases for proposition that "SEC lawsuits are by no means a necessary trigger for inquiry notice"). Unsurprisingly, Woori has failed to point to any Korean law to support the proposition that some governmental authority must make a formal finding of impropriety before the statute of limitations for a private lawsuit will begin to run.

Moreover, an analysis of the "totality of the objective evidence" makes it clear that the FCIC Report was not the talismanic "open sesame" command to unlock the courthouse doors for Woori's action. The formal publication of an extensive "historical accounting" of the overall causes of the recent financial crisis is not the marker for the first practicable moment a private plaintiff may exercise the ability to bring a civil action. FCIC Report at xi. The FCIC Report did not infiltrate the deep depths of Mordor—or the deeper hard drives of Wall Street—to unearth any age-old clandestine activities. Instead, the FCIC began with the large body of publicly available pre-existing literature "developed by congressional committees, gov-

ernment agencies, academics, journalists, legal investigators, and many others" that had already exposed serious indiscretions relating to the crisis. From this vast publicly available library, it began to assemble a comprehensive analysis of the causes of the collapse of certain financial markets. FCIC Report at xii. In fact, many of the FCIC sources cited by Woori in its complaint merely rehash information published years earlier in articles or other publically available materials. *See, e.g.,* Compl. ¶ 66 (citing to FCIC Report at 204 and omitting footnote to October 2007 article).

Moreover, while the FCIC Report provides further elaborations on Merrill Lynch's general practices regarding CDOs—something that was already extensively reported long before publication of the FCIC Report—it provides little additional information specifically applicable to Woori's claims and therefore fails to support the notion that only at this point of revelation could Woori have "practically" brought the present action. In fact, unlike the *MetroPCS* lawsuit filed more than a year-and-a-half prior to May 2009, the FCIC Report fails to explicitly mention *any* specific CDO or security at issue in this case. Instead, the FCIC Report details Merrill Lynch's *generalized* practices relating to mortgage-based assets and CDOs. Thus, Woori's reliance on the general allegations in the FCIC Report directly contradicts its argument. Woori's theory contends that Woori is not claiming that Merrill Lynch "failed to scrutinize loan applications adequately *in general*," but rather that Merrill Lynch's representations relating to "the *particular* securitizations sold to [plaintiff]" were flawed. *See* Pl.'s Resp. App. Ex. 45 (quoting *Fed.*

*Hous. Fin. Agency,* 858 F.Supp.2d at 321 (emphasis in original)).[4] On this basis, Woori maintains that the extensive publicity of Merrill Lynch's general CDO practices failed to put Woori on notice of possible claims. *See id.* If anything, the FCIC Report provides *less* specificity regarding Merrill Lynch's practices as relates to Woori's particular investments than the extensive publications, government investigations, and individual lawsuits such as *MetroPCS* that predated—and likely formed part of the impetus for—the publication of the overarching FCIC Report on the financial crisis.

Undoubtedly, every plaintiff would welcome an equivalent good fortune: the ability to mine hundreds of pages of material produced over a year and a half of investigations by a federally-appointed bipartisan commission officially condemning the targeted defendant for helping produce one of the largest financial fiascos in the history of the United States. However, as a review of this Court's docket confirms, such a once-in-a-lifetime bounty is not a prerequisite to filing a civil action. Although lacking the luster of an official government seal of condemnation, the extensive inquiry conducted by the plaintiffs, investigators, academics, and journalists that preceded the publication of the FCIC Report contain a much more lucrative treasure chest of information about Woori's specific allegations against Merrill Lynch than the FCIC Report itself.

2. *The Breadth of Permissible Discovery in Korean Courts Did Not Affect Woori's Practical Ability to Bring Its Case in this Court*

■ Woori also claims that the FCIC Report was a prerequisite to bringing an

---

**4.** Woori also fails to note that Judge Cote's decision in *Federal Hous. Fin. Agency v. USB* dealt with the more exacting accrual standard applicable under the Securities Act, *not* the accrual standard that would be applicable to the present case under either New York or Korean law.

action because Korean litigants do not possess the equivalent right to ·discovery as litigants in the United States. Pl.'s Resp. 3–4. To begin with, it is not clear that the right to discovery· under Korean procedures is as limited as Woori claims. In fact, Woori has argued in other proceedings that Korean courts have a pre-trial discovery mechanism similar to that possessed by litigants in the United States, which entitles parties to "relatively broad pre-trial discovery." Defs.' ·Reply Ex. 8 ¶ 18.

Regardless of the permissible breadth of discovery in Korean courts—the exact contours of which the parties dispute—Woori confuses the scope of a procedural right to discovery that ordinarily comes to fruition *after* the filing of a complaint, with the actual issue before the Court: whether the amount of information about Merrill Lynch's practices in the CDO market that was already in the public record—that is, information that *preceded* the filing of an action by Woori that might give rise to discovery—was sufficient to give Woori inquiry notice or the practical ability to file an action grounded on that conduct in the first place. For that purpose, discovery procedures, which are set in motion only *after* the filing of a complaint, are irrelevant. Indeed, even under the broad discovery rules prevailing in the United States, to maintain a lawsuit a plaintiff must be able to state a plausible claim based on information gathered *before* formal discovery procedures take effect. The availability of broad discovery therefore has no bearing on a plaintiff's ability to draft a sufficient complaint in the first instance, contrary to what Woori's argument would suggest, nor is discovery permissible to· enable a plaintiff to find the facts necessary to prepare claims for a prospective lawsuit.

In sum, the breadth of permissible discovery in Korea has no *practical* effect on when Woori could have filed a case in this Court and therefore does not affect any statute of limitations determinations. Moreover, as discussed above, the FCIC Report is no "silver bullet"—at least as it pertains to substantiating Woori's specific allegations against Merrill Lynch—and sheds little additional light on Merrill Lynch's treatment of Woori's investments that was not publicly known or could not have been flushed out during discovery.

Therefore, under both the "inquiry. notice" advocated by Defendants and the "practical ability" standard advocated by Woori, the overall controversy surrounding Merrill Lynch's CDO investments and relationship with the ratings agencies, numerous government investigations into Merrill Lynch, and private lawsuits against Merrill Lynch relating to the *specific* CDOs at issue in Woori's claims in this case, were sufficient to put Woori on notice of a putative claim relating to its CDO investments with Merrill Lynch.

### III. *ORDER*

Accordingly, it is hereby

**ORDERED** that the motion (Docket No. 49) of defendants Merrill Lynch & Co., Inc., Merrill Lynch International, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., and Bank of America Corporation to dismiss the complaint of plaintiff Woori Bank is GRANTED.

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**