ANALISA TORRES, United States District Judge *689 Plaintiff, Fire & Police Pension Association of Colorado, brings this action against Defendants,[1] thirty-three banks, alleging violations of the Sherman Act, 15 U.S.C. § 1 et seq. ; the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq. ; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. via mail and wire fraud. Am. Compl., ECF No. 73. Plaintiff also asserts causes of action for unjust enrichment and breach of the implied covenant of good faith and fair dealing. Id. Defendants move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and lack of subject matter jurisdiction under Rule 12(b)(1). ECF No. 113. A subset of those Defendants (the "Foreign Defendants")[2] also move to dismiss *690 the complaint for lack of personal jurisdiction under Rule 12(b)(2). Id. For the reasons stated below, the motions are GRANTED.
BACKGROUND
Except as noted, the following facts are taken from the complaint, which the Court accepts as true for purposes of these motions. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd. , 493 F.3d 87, 98 (2d Cir. 2007) (evaluating a Rule 12(b)(6) motion); J.S. ex rel. N.S. v. Attica Cent. Sch. , 386 F.3d 107, 110 (2d Cir. 2004) (evaluating a Rule 12(b)(1) motion); Metro. Life Ins. Co. v. Robertson-Ceco Corp. , 84 F.3d 560, 566 (2d Cir. 1996) (evaluating a 12(b)(2) motion). Only the relevant facts are summarized here.
This is an action against thirty-three corporate defendants, comprising parents, subsidiaries, and affiliates of nine international banking institutions who participated in the rate-setting process of the Canadian Dollar Offered Rate ("CDOR").[3] Am. Compl. ¶ 2; see also id. § B. The crux of Plaintiff's claim is that Defendants conspired to suppress CDOR to benefit their derivatives trading positions from August 9, 2007 to December 31, 2014 (the "Class Period"). Id. ¶¶ 1-2. Plaintiff, which administers a retirement system for police officers and firefighters, alleges that it was harmed because it transacted "in CDOR-Based Derivatives during the Class Period," including directly with certain Defendants. Id. ¶ 43.
CDOR is "the benchmark used to price Canadian dollar-denominated derivatives in the United States." Id. ¶ 268. It is supposed to reflect the cost of borrowing Canadian dollars in North America. Id. ¶ 3. CDOR is calculated daily based on submissions from the "CDOR Panel"[4] -which included sixteen Defendants.[5] Id. ¶¶ 248, 269. Each CDOR Panel member's submission should reflect the rate at which they are willing to lend against Bankers' Acceptances ("BAs)"[6] for five different tenors.[7] Id. ¶ 269. Thomson Reuters collects these submissions, averages them in accordance with a set formula, and publishes the average rate to financial data providers who distribute it throughout the world. Id. ¶¶ 269-271.
Manipulation of CDOR is central to the claims of the complaint. CDOR is used to price various types of derivatives, which are financial instruments priced, benchmarked, *691 and/or settled based on CDOR ("CDOR-Based Derivatives"). Id. ¶ 2. Changes in CDOR, therefore, impact those derivative transactions. Id. For example, a swap is a derivative in which "two parties exchange the obligation to make a series of periodic payments (e.g. monthly) based on [an] underlying principal amount (e.g. $ 1 billion CAD) for [a] set period (e.g. one year)." Id. ¶ 277. CDOR determines the amount paid or received by each party in a CDOR-Based swap. Id. ¶ 278. There are many different types of CDOR-Based swaps, but in a "plain vanilla" interest rate swap, one party makes payments based on a variable rate (e.g. CDOR) while another makes payments based on a fixed rate. Id. ¶ 279. In that situation, the party making payments based on the variable rate (CDOR) would benefit if CDOR were suppressed. CDOR also impacts "CDOR-Based Loans" in which the loan's interest rate is based on CDOR. Id. ¶ 257-58, 299.
Plaintiff alleges that Defendants conspired to suppress CDOR during the Class Period by submitting artificially low rates that did not reflect the rate at which they were lending Canadian dollars in North America in order to increase profits from their CDOR-Based Derivatives positions. Id. ¶¶ 5-6, 329. Plaintiff claims that prior to the start of the Class Period in 2007, Defendants had large CDOR-Based Loan portfolios in which borrowers made interest payments based on CDOR, but in 2007, they reduced their CDOR-Based lending and increased sales of CDOR-Based Derivatives. Id. ¶¶ 299-302. Plaintiff alleges that this created a motive and financial incentive for Defendants to suppress CDOR to reduce the amount of interest they were required to pay on their CDOR-Based Derivatives. Id. ¶ 309.
In support of its claims, Plaintiff submits the following evidence. First, in terms of Defendants' collusion, Plaintiff alleges, among other things, that Defendants submitted identical or very similar CDOR rates for certain tenors at various points during the Class Period. Id. § IV.A. Second, to support its claim that CDOR was suppressed, Plaintiff compares CDOR to two other allegedly comparable benchmarks during the Class Period. Id. § III. Plaintiff also relies on a report of the Investment Industry Regulatory Organization of Canada ("IIROC"). Id. ¶ 261. In 2011, the IIROC announced it was "initiating a review of the CDOR rate-setting process," id. ¶ 348, and in January 2013, it released a "report on its review of CDOR supervisory practices" and reported that CDOR submissions were "prepared by employees of [CDOR panel] dealers' parent/affiliate bank or by persons that are dually-employed at both the [CDOR panel dealer and the bank]," id. ¶ 261. The IIROC report recommended that the rate-setting process be clarified, and regulations be implemented to control the rate-setting process to prevent manipulation. Id.
Defendants are thirty-three financial institutions. Specifically, nine Defendants are parent banks and the other twenty-four are subsidiaries or affiliates of the parent banks. See id. § B. Many Defendants are incorporated and headquartered in foreign countries, including all of the parent banks with the exception of Bank of America. Id. ¶¶ 44, 72, 90, 106, 143, 163, 193, 213, 227. Sixteen Defendants served on the CDOR Panel, all of which are located abroad, see id. ¶¶ 44, 72, 90, 143, 163, 193, 136, 219, 227, 95, 243, 202, 248,[8] while *692 the other Defendants allegedly furthered the conspiracy by marketing and selling CDOR-Based Derivatives to U.S. investors, see, e.g., id. ¶ 28, or acting as a holding company for subsidiaries, see, e.g., id. ¶ 111.
DISCUSSION
I. 12(b)(2) Legal Standard
On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." Penguin Grp. (USA) Inc. v. Am. Buddha , 609 F.3d 30, 34 (2d Cir. 2010). In deciding "a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway." Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A. , 722 F.3d 81, 84 (2d Cir. 2013). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." Id. at 84 (internal quotation marks and citation omitted). At the pleading stage-and prior to discovery-a plaintiff need only make a prima facie showing that jurisdiction exists by pleading legally sufficient allegations of jurisdiction. Id. at 84-85. If the court considers only the pleadings and affidavits, the plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." In re Terrorist Attacks on Sept. 11, 2001 , 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citation omitted). Courts may rely on materials outside the pleadings in considering a motion to dismiss for lack of personal jurisdiction, but they must be construed in the light most favorable to the plaintiff. See DiStefano v. Carozzi N. Am., Inc. , 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." MacDermid, Inc. v. Deiter , 702 F.3d 725, 727 (2d Cir. 2012) (internal quotation marks and citation omitted).
II. Analysis
"Jurisdiction to resolve cases on the merits requires ... authority over the parties (personal jurisdiction), so that the court's decision will bind them." Ruhrgas AG v. Marathon Oil Co. , 526 U.S. 574, 577, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). The Court, therefore, will first address Foreign Defendants' "objection to this Court's exercise of personal jurisdiction over them before addressing the arguments brought by all Defendants that Plaintiff has failed to state a claim." 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc. , No. 13 Civ. 981, 2015 WL 1514539, at *5 (S.D.N.Y. Mar. 31, 2015).
Foreign Defendants argue that the Court lacks personal jurisdiction over them because they are "headquartered in and chartered or organized under the laws of Canada, the United Kingdom, or Germany," and although some conduct a small portion of their business in the United States, none of that business is related to current lawsuit. Def. P.J. Mem. at 3, ECF No. 114. In particular, Foreign Defendants note that "with respect to those Foreign *693 Defendants that served on the CDOR panel, the offices responsible for determining and transmitting their respective CDOR submissions to Thomson Reuters in Canada were all located in Canada." Id.[9]
"A prima facie showing of personal jurisdiction requires: (1) procedurally proper service of process, (2) 'a statutory basis for personal jurisdiction that renders such service of process effective' and (3) that 'the exercise of personal jurisdiction ... comport[s] with constitutional due process principles.' " In re Foreign Exch. Benchmark Rates Antitrust Litig. , No. 13 Civ. 7789, 2016 WL 1268267, at *1 (S.D.N.Y. Mar. 31, 2016) (quoting Licci v. Lebanese Canadian Bank, SAL , 673 F.3d 50, 59-60 (2d Cir. 2012) ). The parties' dispute concerns the third requirement-whether or not the exercise of personal jurisdiction would violate constitutional due process. Plaintiff asserts that the Court has specific, rather than general, personal jurisdiction over Foreign Defendants.[10] Pl. P.J. Opp. at 1, ECF No. 136.
"[T]o exercise jurisdiction consistent with due process, the defendant's suit related conduct must create a substantial connection with the forum." Walden v. Fiore , 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014). Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy ... activity or an occurrence that takes place in the forum." Goodyear Dunlop Tires Operations, S.A. v. Brown , 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (internal quotation marks, citation, and alterations omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Id. (internal quotation marks and citation omitted). A plaintiff asserting specific personal jurisdiction "must establish the court's jurisdiction with respect to each claim asserted." Sunward Elecs., Inc. v. McDonald , 362 F.3d 17, 24 (2d Cir. 2004).
Courts engage in a two-step analysis to determine whether the exercise of specific jurisdiction is appropriate. See Licci v. Lebanese Canadian Bank, SAL , 732 F.3d 161, 170 (2d Cir. 2013). The first step is evaluating the "quality and nature of the defendant's contacts with the forum ... under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum ... minimum contacts [necessary to support such jurisdiction] exist *694 where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Id. (quotation marks omitted) (alteration in original). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Id. (internal quotation marks and citation omitted).
Plaintiff argues that there are three independent methods of establishing minimum contacts in this case: (1) purposeful availment; (2) purposeful direction; and (3) conspiracy jurisdiction. Pl. P.J. Opp. at 3. To evaluate Plaintiff's contentions, the Court will first determine the relevant "forum" for assessing the minimum contacts related to each federal claim. It will then analyze whether Foreign Defendants have purposefully availed themselves of the forum. Next, it will assess whether the Court has personal jurisdiction over Foreign Defendants under a purposeful direction theory. Then it will analyze whether Plaintiff has alleged conspiracy jurisdiction. Finally, if Plaintiff establishes minimum contacts, the Court will determine whether the exercise of personal jurisdiction would comport with fair play and substantial justice.
A. Relevant Forum
"For an out-of-state defendant in a federal question case, 'federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process.' " McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani , 295 F.Supp.3d 404, 410 (S.D.N.Y. 2017) (quoting Sunward Elecs., Inc. , 362 F.3d at 22 ).
a. RICO Claim
The RICO statute "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found.... [A] civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." PT United Can Co. Ltd. v. Crown Cork & Seal Co. , 138 F.3d 65, 71 (2d Cir. 1998). "Additional defendants may be subject to nationwide personal jurisdiction, but '[t]his jurisdiction is not automatic[;] [it] requires a showing that the 'ends of justice' so require.' " 7 W. 57th St. Realty Co., LLC , 2015 WL 1514539, at *7 n.2 (quoting PT United , 138 F.3d at 71 ) (alterations in original). "Only 'if the allegations in the [c]omplaint state[ ] a viable RICO claim, ... would [it] be proper to exercise ends of justice RICO jurisdiction.' " Id. (citation omitted) (alterations in original); see also BWP Media USA Inc. v. Hollywood Fan Sites, LLC , 69 F.Supp.3d 342, 352 (S.D.N.Y. 2014) ("Plaintiffs cannot rely upon [the nationwide service of process jurisdiction provisions of the RICO statute] to establish personal jurisdiction over each of the defendants if the RICO claim is dismissed." (internal quotation marks and citation omitted) ).
As discussed below, Plaintiff's RICO claim is impermissibly extraterritorial. This Court, therefore, cannot apply the RICO statute's nationwide personal jurisdiction provision. Instead, the Court will apply the "personal jurisdiction rules of the forum state, provided that those rules are consistent with the requirements of Due Process." Penguin Grp. (USA) Inc. , 609 F.3d at 35. In other words, the relevant contacts for the RICO claim are Defendants' sales of CDOR-Based Derivatives in New York, not the United States. See *695 7 W. 57th St. Realty Co., LLC , 2015 WL 1514539, at *7 n.2, 10-11 (analyzing New York-based contacts after determining that nationwide service of process provision did not apply).
b. CEA and Sherman Act Claims
Although the Second Circuit has not opined on this issue, courts in this District have applied a nationwide contacts test to determine personal jurisdiction for CEA and Sherman Act claims. Sullivan v. Barclays PLC , No. 13 Civ. 2811, 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017) ; In re LIBOR-Based Fin. Instruments Antitrust Litig. , No. 11 MDL 2262, 2015 WL 4634541, at *18-19 (S.D.N.Y. Aug. 4, 2015) ; In re Amaranth Nat. Gas Commodities Litig. , 587 F.Supp.2d 513, 526 (S.D.N.Y. 2008), aff'd , 730 F.3d 170 (2d Cir. 2013).[11] The Court, therefore, will analyze these claims based on Defendants' suit-related conduct with the United States.
B. Purposeful Availment Theory
Plaintiff alleges that Foreign Defendants purposefully availed themselves of the United States by "transacting CDOR-Based Derivatives with investors in the U.S. while manipulating CDOR." Pl. P.J. Opp. at 3-10. The Court will conduct a two-step analysis. First, the Court will determine whether the sale of CDOR-Based Derivatives in the United States in connection with a CDOR manipulation scheme amount to the "suit-related" contacts which establish the basis for personal jurisdiction. If the sales are "suit-related," the Court will then examine whether Plaintiff has adequately alleged that each Foreign Defendant sold CDOR-Based Derivatives in the relevant forum.
First, the Court rejects Plaintiff's argument that the sales relate to the CDOR manipulation because Plaintiff transacted in CDOR-Based Derivatives in the United States, and was, therefore, injured in the United States, Pl. P.J. Opp. at 8,[12] because "the presence of U.S. victims alone does not make out jurisdiction." Sullivan , 2017 WL 685570, at *44.
Next, Plaintiff alleges that the sale of CDOR-Based Derivatives in the United States constitutes "suit-related" conduct because Foreign Defendants' "substantial CDOR-Based Derivatives positions in the United States provided the motivation for manipulating CDOR and demonstrate that they reached into the forum to profit from their scheme." Pl. P.J. Opp. at 7. In other words, the sales are related to Plaintiff's claims because it was a profit-motivated scheme and the sales provided the mechanism to realize the profits.
*696 As to this argument, Charles Schwab Corp. v. Bank of Am. Corp. , 883 F.3d 68 (2d Cir. 2018), is instructive. In Schwab , the Second Circuit analyzed whether the defendants had purposefully availed themselves of California based on a similar scheme where the defendants allegedly submitted artificially low quotes to suppress the London Interbank Offered Rate ("LIBOR"), which caused the plaintiffs to receive lower returns on certain debt instruments they purchased from the defendants in California. Id. at 78. The Circuit found that the sales of LIBOR-based instruments in California constituted sufficient contacts for claims that "concern transactions in California," but not for "claims premised solely on Defendants' false LIBOR submissions in London." Id. at 82-85. In particular, the Circuit lacked personal jurisdiction over the plaintiffs' "claim that Defendants committed fraud through their daily LIBOR submissions to the BBA [British Bankers' Association] in London." Id. at 83. The Circuit reasoned that "the relevant jurisdictional question for such fraud claims is whether the California transactions constitute 'suit-related conduct [that] create[s] a substantial connection with [California]." Id. at 83-84. (citation omitted) (alterations in original). The Circuit held that the California transactions did not constitute suit-related conduct because those transactions "did not cause Defendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold Defendants liable for those submissions." Id. at 84.
Post- Schwab , at least one court in this District has held that U.S.-based trading is related to a foreign conspiracy to suppress a foreign interest rate benchmark if the conspiracy is profit-motivated. See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A. , No. 16 Civ. 5263, 2018 WL 4830087, at *8 (S.D.N.Y. Oct. 4, 2018). In FrontPoint , the court found personal jurisdiction because "where the complaint plausibly alleges a profit-motive, as here, the U.S.-based trading is properly alleged to have been a part of the conspiracy and to be related to the overseas jurisdiction. Such U.S.-based trading, when alleged to be the object of the conspiracy, can support the exercise of personal jurisdiction." Id. (emphasis added). The court distinguished Schwab because the conspiracy at issue in Schwab was reputation-based rather than profit-motivated. Id. However, the court acknowledged that under Schwab and other cases in this District, the U.S.-based trading transactions would not constitute suit-related contacts if the conspiracy was reputation-based rather than profit-motivated. Id. However, in Dennis v. JPMorgan Chase & Co. , a district court rejected the plaintiffs' argument that the defendants' "market[ing] and s[ales of] BBSW-[B]ased [D]erivatives in the United States" were sufficiently related to the plaintiffs' claims because they alleged a profit-motivated conspiracy. 343 F.Supp.3d 122, 203-206 (S.D.N.Y. 2018). Finding that "the conspiracy to manipulate LIBOR alleged in Charles Schwab was indeed motivated in part by financial incentives,"[13] and not solely reputation-based, the court concluded that " Charles Schwab controls here and precludes a finding of personal jurisdiction ... through the Foreign Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs ... over *697 plaintiffs' federal claims on the basis of the Foreign Defendants' transactions in BBSW-Based Derivatives in the United States." Id. at 205-06.
This Court, however, need not decide that issue because Plaintiff has failed to plausibly allege a profit motive. Plaintiff alleges that Defendants had a common profit motive to suppress CDOR because they had a "net-short exposure to CDOR during the Class Period" because they "held substantially more CDOR-Based Derivatives contracts, where they made interest payments, than CDOR-Based Loans, where they received interest." Am. Compl. ¶¶ 7, 308. In other words, Defendants profited if CDOR decreased because they paid less in interest payments. This theory requires that Defendants held a net-short exposure to CDOR because otherwise any profits gained as a result of paying less interest would be offset by losses from receiving less interest as a lender. See Am. Compl. ¶ 298 ("Defendants had a common motive to suppress CDOR during the Class Period as their business shifted away from CDOR-Based lending to sale of CDOR-Based Derivatives"). See also Gelboim v. Bank of Am. Corp. , 823 F.3d 759, 783 (2d Cir. 2016) ("[C]ommon sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR.... It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses that it would suffer as a lender.").
At the outset, the Court notes that courts in this Circuit have found it difficult to plausibly allege a profit-motivated conspiracy, particularly if the profits depend on all the defendants maintaining the same position for the entire class period. See In re LIBOR-Based Fin. Instruments Antitrust Litig. , No. 11 MDL 2262, 2016 WL 7378980, at *2 (S.D.N.Y. Dec. 20, 2016) ("[T]he premise that the primary goal of the conspiracy was to increase profits by lowering the interest rate the banks had to pay when they were in the role of borrower is not plausible."). See also Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG , 277 F.Supp.3d 521, 554-55 (S.D.N.Y. 2017) ("As noted in LIBOR VI and suggested in Gelboim , it is harder to infer a conspiracy from individual acts of trader-based manipulation because large financial institutions are both buyers and sellers of derivatives products, and thus any changes may well offset each other."). Relying on a more developed record, the court in LIBOR-Based Financial Instruments Litigation , rejected the argument that the conspiracy was profit-motivated because "it would have required all of the sixteen panel banks to have made a parallel decision to be net borrowers of money over the suppression period in the LIBOR-based lending market" and "plaintiffs [had] not offered any evidence that the panel banks made such a decision or were in fact net borrowers." 2016 WL 7378980, at *3.[14]
At this stage, the Court accepts the facts alleged in the complaint as true, *698 and construes them in the light most favorable to Plaintiff. See ATSI Commc'ns , 493 F.3d at 98. However, Plaintiff's "motive allegations [must be] 'plausible on its face.' " In re LIBOR-Based Fin. Instruments Antitrust Litig. , 27 F.Supp.3d 447, 468 (S.D.N.Y. 2014) (citing Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Plaintiff has failed to plausibly allege a profit-motivated conspiracy because it does not allege that Defendants held a net short exposure to CDOR during the Class Period. Beginning in 2007, Plaintiff alleges that "Defendants substantially reduc[ed] their lending activity and the size of their CDOR-Based Loan portfolios," and "began heavily marketing and selling ... [CDOR-Based Derivatives]." Am. Compl. ¶¶ 301-02. "These CDOR-Based Derivatives transactions left Defendants with the obligation to pay a substantial amount of interest based on CDOR [because] [e]very time a ... corporation entered into an interest rate swap with a Defendant to exchange its obligation to make interest payments based on CDOR for a fixed interest rate, the Defendant on the other side of that transaction assumed the obligation to make interest payments equal to CDOR." Id. ¶ 306. Accepting these factual allegations as true, they do not allege that Defendants "held a net-short exposure to CDOR" as they do not allege that Defendants held more CDOR-Based contracts where they made payments based on CDOR, than CDOR-Based contracts where they received payments based on CDOR.
As "further factual enhancement" to support these "naked assertion[s]," Twombly , 550 U.S. at 557, 127 S.Ct. 1955, Plaintiff provides a chart which allegedly demonstrates that by 2014, Defendants[15] were "net payors of interest based on CDOR ... [because] they held substantially more CDOR-Based Derivatives contracts, where they made interest payments, than CDOR-Based Loans, where they received interest." Am. Compl. ¶¶ 307-08, fig.5.
Accepting as true that the chart establishes that Defendants held more CDOR-Based Derivatives than CDOR-Based Loans, "the [chart] does not plausibly support an allegation that any particular bank was net short at any particular time (let alone that all of the [d]efendants were net short throughout the alleged conspiratorial period)." Commodity Exch., Inc. , 213 F.Supp.3d 631, 663 (S.D.N.Y. 2016) (finding the plaintiffs' net short theory to be implausible because data did not support it). See also In re London Silver Fixing, Ltd., Antitrust Litig. , 213 F.Supp.3d 530, 561 n.20 (S.D.N.Y. 2016) (rejecting the plaintiffs' theory that "Defendants stood to benefit from the alleged conspiracy because they held large unhedged positions" when the "supporting data gave little insight into [each Defendant's] position specifically in the [relevant] market"). First, Plaintiff asserts that Defendants conspired from 2007 to 2014, but the chart only refers to 2014. Second, even accepting as true that the chart establishes that seven Defendants collectively held more CDOR-Based Derivatives than CDOR-Based Loans, it does not provide any support for the assertion that each Defendant did so individually. Commodity Exch., Inc. , 213 F.Supp.3d at 648 n.16 ("Aggregate data tells the Court little about the actual position of any particular Defendant. The fact that in the aggregate large bullion banks were net short does not mean that any given Defendant was net short consistently or even occasionally.").
*699 Third, and most importantly, accepting Plaintiff's assertion that the chart establishes that Defendants individually and collectively held more CDOR-Based Derivatives than CDOR-Based Loans, it does not distinguish between CDOR-Based Derivatives that obligated Defendants to make payments based on CDOR ("CDOR-Paying Derivatives") versus those that obligated Defendants to receive payments based on CDOR ("CDOR-Receiving Derivatives"). As Plaintiff itself alleges, in a CDOR-Derivative transaction a Defendant could either be the party making payments based on CDOR or the party receiving payments based on CDOR. See e.g. , Am. Compl. ¶¶ 279, 284 ("[I]n the most common 'plain vanilla' interest rate swap, the parties agree to a 'fixed-for-floating' exchange in which one party will make payments based on a variable price or rate, e.g. CDOR, while the other will make payments based on a fixed rate."). In an individual transaction, therefore, a Defendant only profits from the suppression of CDOR if it is making payments based on CDOR, rather than receiving payments based on CDOR. In the aggregate, because both CDOR-Based Loans and CDOR-Receiving Derivatives obligate a Defendant to receive payments based on CDOR, a Defendant would only have a "net short exposure to CDOR," and profit from CDOR suppression, if its portfolio of CDOR-Paying Derivatives outweighed its portfolio of CDOR-Loans and CDOR-Receiving Derivatives. Because the Chart does not distinguish between CDOR-Paying Derivatives and CDOR-Receiving Derivatives, the complaint does not plausibly allege that Defendants were "[net] short at any particular point during the Class Period," Commodity Exch., Inc. , 213 F.Supp.3d at 663, and therefore had a profit-based motive. See also In re London Silver Fixing, Ltd., Antitrust Litig. , 213 F.Supp.3d at 561 n.20 (rejecting argument that Defendant stood to benefit from conspiracy because it held a large unhedged position when the data provided detailed Defendant's "total derivatives positions, telling the Court nothing about its position specifically in the [relevant] market.").
Furthermore, the complaint generally alleges that Defendants grew their CDOR-Based Derivatives portfolios during the Class Period, but it similarly fails to distinguish between CDOR-Paying and CDOR-Receiving Derivatives. See, e.g. , Am. Compl. ¶ 302 ("RBC and TD Bank reported that they more than doubled their positions in CDOR-Based Derivatives ... during 2007 and 2008."); id. ¶ 303 ("Defendants ... began heavily marketing and selling interest rate swaps, FRAs, and other CDOR-Based Derivatives.").
Tellingly, Plaintiff does not respond to this argument directly in its opposition brief-instead arguing that "[t]he [c]omplaint alleges in detail how Defendants created large 'proprietary trading' operations for the express purpose of trading CDOR-Based Derivatives on the firm's own account to generate trading profits." Pl. Opp. at 12. The Court rejects Plaintiff's argument because although the complaint references the existence of trading desks, and that traders were compensated based on their profits, it does not allege that those desks caused persistent net short positions.[16] Accordingly, Plaintiff has failed to plausibly allege a profit-motivated conspiracy and, therefore, the sale of CDOR-Based *700 Derivatives in the United States do not constitute "suit-related contacts" which establish the basis for personal jurisdiction under the purposeful availment theory.[17]
C. Purposeful Direction Theory
Alternatively, Plaintiff argues that the Court has specific personal jurisdiction under a "purposeful direction theory." Pl. P.J. Opp. at 10. Under this theory, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Licci , 732 F.3d at 173. "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." Terrorist Attacks , 714 F.3d at 674.
Essentially, Plaintiff argues that Foreign Defendants expressly aimed their conduct at the forum because they "maintained substantial CDOR-Based Derivatives positions in the forum while they manipulated CDOR for profit." Pl. P.J. Opp. at 10. Specifically, "Defendants' large CDOR-Based Derivatives positions in the forum create the plausible inference that they intended to benefit these positions when manipulating CDOR." Id. at 13. However, as discussed above, the complaint fails to plausibly allege that Defendants intended to profit from CDOR-Based Derivatives trading because it does not adequately allege that they held a net short exposure (and, therefore, would profit if CDOR was suppressed). Accordingly, Plaintiff has failed to establish personal jurisdiction as to any Foreign Defendant on the basis of purposeful direction.
D. Conspiracy Jurisdiction Theory
To allege a conspiracy theory of jurisdiction, Plaintiff "must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that state." Schwab , 883 F.3d at 87. Additionally, Plaintiff must demonstrate "that a co-conspirator's minimum contacts were in furtherance of the conspiracy." Id. "To allow jurisdiction absent [such] a showing ... would be inconsistent with the 'purposeful availment' requirement." Id. at 87.
Plaintiff alleges that the "[c]omplaint satisfies this test because it plausibly alleges that: (1) a conspiracy to unlawfully boost trading profits by manipulating CDOR existed; (2) each [Foreign] Defendant participated in the conspiracy, and (3) a co-conspirator-including the U.S.-based Defendants that do not contest personal jurisdiction-took overt acts in the forum (selling price-fixed CDOR-Based Derivatives here) and directed at the forum (by submitting false CDOR submissions directed in substantial part at positions here)." Pl. P.J. Opp. at 16. The Court disagrees.
Here, as in Schwab , the complaint "does not permit an inference that certain Defendants' sales in [the United States] were in furtherance of the conspiracy." Schwab , 883 F.3d at 87. As previously discussed, the complaint fails to plausibly allege that the conspiracy was profit-motivated and, therefore, that the sales in the United States constitute minimum contacts in furtherance of the conspiracy. Plaintiff, accordingly, *701 has not established conspiracy jurisdiction.[18]
E. Pendent Jurisdiction
Thus far, the Court's discussion of personal jurisdiction has focused on Plaintiff's federal law claims. "The doctrine of pendent personal jurisdiction provides that 'where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available.' " Schwab , 883 F.3d at 88 (quoting IUE AFL-CIO Pension Fund v. Herrmann , 9 F.3d 1049, 1056 (2d Cir. 1993) ).
The Court has concluded that Plaintiff has not made a prima facie showing that Foreign Defendants are subject to the personal jurisdiction of this Court. The Court, therefore, is "without a basis to exercise pendent jurisdiction over [ ] Foreign Defendants in respect of [Plaintiffs'] state law claims." Dennis , 343 F.Supp.3d at 211.
Accordingly, Foreign Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED.[19]
F. Jurisdictional Discovery
Plaintiff argues alternatively that it is entitled to limited jurisdictional discovery "to confirm that [Foreign] Defendants established substantial CDOR-Based Derivatives positions in the forum while manipulating CDOR." Pl. P.J. Opp. at 19-20. "Whether to allow jurisdictional discovery is within the discretion of this Court." Laydon v. Mizuho Bank, Ltd. , No. 12 Civ. 3419, 2015 WL 1515358, at *7 (S.D.N.Y. Mar. 31, 2015) (citing Best Van Lines, Inc. v. Walker , 490 F.3d 239, 255 (2d Cir. 2007) ); see also Stutts v. De Dietrich Grp. , 465 F.Supp.2d 156, 169 (E.D.N.Y. 2006) ("District courts in this [C]ircuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction."). Plaintiff has failed to establish personal jurisdiction, and therefore, is not entitled to jurisdictional discovery.
III. Rule 12(b)(6) Legal Standard
To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly , 550 U.S. at 570, 127 S.Ct. 1955 ). The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. See ATSI Commc'ns , 493 F.3d at 98. A plaintiff is not required to provide "detailed factual allegations," but must assert "more than labels and conclusions." Twombly , 550 U.S. at 555, 127 S.Ct. 1955. Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. Pleadings cannot survive by making "naked assertion[s] devoid of further factual enhancement," and a court is not "bound to accept as true a *702 legal conclusion couched as a factual allegation." Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks and citation omitted).
IV. Analysis
Having dismissed Foreign Defendants' for lack of personal jurisdiction, the Court will now consider the remaining Defendants' motion to dismiss. The Court will first address Defendants' arguments with respect to Plaintiff's Sherman Act claim. Defendants argue that Plaintiff's Sherman Act claim should be dismissed because it (1) is partially time barred, (2) Plaintiff lacks standing to bring the claim, and (3) Plaintiff has failed to plausibly allege an antitrust conspiracy. Def. Mem. at 8-25, ECF No. 132.
A. Sherman Act
1. Statute of Limitations
Defendants argue that Plaintiff's Sherman Act claim is partially time barred with respect to all Defendants and fully time barred as to Bank of America and its subsidiaries and affiliates. Def. Mem. at 41. Plaintiff alleges that the statute of limitations was tolled because of Defendants' misconduct. Pl. Opp. at 38-39.
a. Limitations Period
"A Sherman Act § 1 claim is subject to a four-year statute of limitations that runs from the date of injury." In re Interest Rate Swaps Antitrust Litig. , 261 F.Supp.3d 430, 487 (S.D.N.Y. 2017). Plaintiff filed this action on January 12, 2018. Compl., ECF No. 1. Defendants argue, therefore, that Plaintiff's claim, to the extent based on injuries incurred before January 12, 2014, is time barred. Def. Mem. at 40-41. The Court agrees.
Defendants further argue that the Sherman Act claim against Defendant Bank of America and its subsidiaries and affiliates[20] is fully time barred because "Merrill Lynch Canada, Inc. withdrew from the CDOR Panel on December 5, 2012" and, therefore, "neither it nor any of its corporate parents or affiliates [ ] were plausibly involved in any alleged conspiracy after that date." Def. Mem. at 21 n.17. Plaintiff responds that the "question is not withdrawal from the CDOR Panel, it is withdrawal from the conspiracy" and alleges that Bank of America continued to participate in the conspiracy by selling CDOR-Based Derivatives after its 2012 withdrawal from the CDOR Panel. Pl. Opp. at 40. However, the crux of Plaintiff's conspiracy claim is the artificial submission of CDOR rates, see Am. Compl. ¶ 329 ("Defendants maximized their manipulative impact on the CDOR fixing by coordinating artificially lower submissions as a group"), and there are no specific allegations that Bank of America, or its subsidiaries, communicated with CDOR Panel members or otherwise influenced CDOR outside of the Panel, see generally id. § IV.A.[21] The trading of CDOR-Based Derivatives, therefore, "even if adequately alleged, is an innocent activity if not connected to the Panel Members' conspiracy." FrontPoint , 2018 WL 4830087, at *4 (dismissing non-Panel banks because only allegations *703 were that they traded derivatives in the United States). Accordingly, Plaintiff's Sherman Act claim against Bank of America Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch Canada Inc. ("Bank of America Defendants") is fully time barred.
b. Fraudulent Concealment
"[A] statute of limitations may be tolled due to the defendant's fraudulent concealment." Koch v. Christie's Int'l PLC , 699 F.3d 141, 157 (2d Cir. 2012) (internal quotation marks and citation omitted). If a plaintiff can show fraudulent concealment, the statute of limitations is tolled for all of his federal claims. See Atl. City Elec. Co. v. Gen. Elec. Co. , 312 F.2d 236, 239 (2d Cir. 1962) ("[A]ll federal limitation statutes are subject to the doctrine of fraudulent concealment, so that if the doctrine applies the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing." (internal quotation marks and citation omitted) ). "[T]he purpose of the fraudulent-concealment doctrine is to prevent a defendant from concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." State of N.Y. v. Hendrickson Bros., Inc. , 840 F.2d 1065, 1083 (2d Cir. 1988) (internal quotation marks and citation omitted). To allege fraudulent concealment, Plaintiff must allege (1) that the defendant concealed the existence of Plaintiff's cause of action, (2) that Plaintiff remained ignorant until some point within the limitations period, and (3) Plaintiff's ignorance was not attributable to a lack of due diligence. Id. A claim of fraudulent concealment must be pleaded with particularity, in accordance with the heightened pleading standards of Federal Rule of Civil Procedure 9(b). See Nat'l Grp. for Commc'ns & Computs., Ltd. v. Lucent Techs. Inc. , 420 F.Supp.2d 253, 265 (S.D.N.Y. 2006).
Plaintiff has adequately pleaded that Defendants concealed the existence of Plaintiff's cause of action. In the Second Circuit, plaintiffs may "prove concealment by showing either that the defendants took affirmative steps to prevent plaintiffs' discovery of the conspiracy, or that the conspiracy itself was inherently self-concealing." In re Nine W. Shoes Antitrust Litig. , 80 F.Supp.2d 181, 192 (S.D.N.Y. 2000). Furthermore, "price-fixing conspiracies are inherently self-concealing." In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig. , No. 00 Civ. 7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) (citing Hendrickson Bros. , 840 F.2d at 1084 ). Here, Plaintiff alleges Defendants engaged in a price-fixing conspiracy, see Am. Compl. ¶ 5, § IV.E, and, therefore, Plaintiff has satisfied the first prong of the test.
Plaintiff, however, fails to adequately plead the second prong of fraudulent concealment with particularity because the complaint does not specify when Plaintiff became aware of the violations. See Am. Compl. ¶¶ 419-425; see also Hinds Cty., Miss. v. Wachovia Bank N.A. , 620 F.Supp.2d 499, 520 (S.D.N.Y. 2009) ("The [complaint] does not specify when any Named Plaintiffs or Class members became aware of the antitrust violations, and therefore does not state with particularity the circumstances constituting fraud or mistake." (internal quotation marks and citation omitted) ).
Nor has Plaintiff plausibly alleged that it exercised due diligence. The complaint does not allege that Plaintiff performed due diligence, instead stating that "Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing *704 manipulative acts and could not have discovered same by exercise of due diligence." Am. Compl. ¶ 425. "Due diligence is not adequately pled if plaintiffs 'did not allege in the [complaint] that they exercised due diligence' or if they 'make no allegation of any specific inquiries of [defendants], [or] detail when such inquiries were made, to whom, regarding what, and with what response.' " Hinds Cty. , 620 F.Supp.2d at 521 (quoting In re Merrill Lynch Ltd. P'ships Litig. , 154 F.3d 56, 60 (2d Cir. 1998) ).
Finally, the Court rejects Plaintiff's argument that "Defendants' implicit and explicit representations of CDOR's accuracy toll all applicable statutes of limitation at the pleading stage." Pl. Opp. at 39. Schwab. , 883 F.3d at 98, the case Plaintiff relies on, is inapposite. Although the Schwab Court held that the plaintiff "reasonably relied on [ ] assurances, thus delaying the start of the limitations period," the assurances were reports from the British Bankers' Association that "its own investigation had confirmed the accuracy of LIBOR." Id. Plaintiff here does not allege that Thomson Reuters informed Plaintiff, or anyone, that it conducted an investigation which confirmed the accuracy of CDOR. See generally Am. Compl. Instead, the "assurances" Plaintiff relies on are essentially that Defendants represented that CDOR was legitimate because they continued to make CDOR submissions without announcing that the rates were inaccurate. See Id. ¶ 421. Reassurances dissipate a duty of inquiry "only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concerns." LC Capital Partners, LP v. Frontier Ins. Grp., Inc. , 318 F.3d 148, 155 (2d Cir. 2003). An ordinary investor would not be allayed by Defendants' representations. See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig. , No. 11 MDL 2262, 2015 WL 6243526, at *115 (S.D.N.Y. Oct. 20, 2015) ("[A] person of ordinary intelligence would have understood the banks' and the BBA's incentives to deny manipulating LIBOR."). These representations, therefore, do not toll the statute of limitations.
Moreover, Plaintiff has alleged no facts indicating why it waited until 2018 to bring this lawsuit when all of the information it relies upon in its complaint has been publicly available since 2013. Cf. Nine W. Shoes , 80 F.Supp.2d at 193 (finding that plaintiffs satisfied due diligence requirements when they filed their complaint within days of national media reporting on allegations of price-fixing by the defendant).
Because Plaintiff has failed to satisfy prongs two and three of the fraudulent concealment test, the Court holds that the statute of limitations was not tolled by the doctrine of fraudulent concealment.
Defendants' motion to dismiss Plaintiff's Sherman Act claim as time barred to the extent it is based on injuries incurred before January 12, 2014 is GRANTED. Defendant's motion to dismiss Plaintiff's Sherman Act claim against the Bank of America Defendants as fully time barred is GRANTED.
2. Shearman Act Antitrust Standing
Defendants argue that Plaintiff has failed to plead an antitrust injury because "Plaintiff does not plausibly allege that CDOR was artificially suppressed when Plaintiff allegedly transacted in CDOR-linked instruments." Def. Mem. at 21. Plaintiff alleges that it was injured because it entered into CDOR-Based Derivatives transactions during the Class Period, including "more than $ 1 billion in Canadian dollar foreign exchange forwards" and "more than $ 80 billion in CDOR-based interest rate swaps." Am. Compl. ¶ 397. Because the CDOR rate was *705 "artificially low" at that time due to Defendant's manipulation, Plaintiff received less interest on its interest rate swaps and paid more in exchange for Canadian dollars under the foreign exchange forward agreements[22] than it would have absent the manipulation. Id. ¶¶ 401, 407.
To plead antitrust standing, Plaintiff must allege that "(1) it suffered an antitrust injury and (2) it is an acceptable plaintiff to pursue the alleged antitrust violations." In re Aluminum Warehousing Antitrust Litig. , 833 F.3d 151, 157 (2d Cir. 2016). To satisfy the first requirement, Plaintiff must plausibly allege: "(i) an injury-in-fact; (ii) that has been caused by the [antitrust] violation; and (iii) that is the type of injury contemplated by the statute." Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc. , 369 F.3d 212, 220 (2d Cir. 2004). Having found that Plaintiff's antitrust claim is time barred to the extent it is based on injuries incurred before January 12, 2014, the Court will only consider injuries that allegedly occurred after that date.
Plaintiff alleges that it adequately pleaded injury "by alleging that Defendants conspired to manipulate CDOR, a component of price in its CDOR-Based Derivatives transactions and that it got less for its money as a result." Pl. Opp. at 15-16 (internal quotation marks and citation omitted). Plaintiff further contends that its claims are supported by statistical analysis. Id. However, as explained further below, Plaintiff's statistical evidence contradicts its claims because it demonstrates that CDOR was not suppressed during the relevant time-period (post-2014).
At the motion to dismiss stage, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in Plaintiff's favor. ATSI Commc'ns , 493 F.3d at 98. However, "that principle does not apply to general allegations that are contradicted by 'more specific allegations in the [c]omplaint.' " DPWN Holdings (USA), Inc. v. United Air Lines, Inc. , 747 F.3d 145, 151-52 (2d Cir. 2014) (citation omitted). Here, although Plaintiff alleges that it was harmed because it entered into transactions where it "received less interest than it should have" because CDOR was suppressed, see, e.g. , Am. Compl. ¶ 401, the more "specific allegations" Plaintiff provides to support its claim that CDOR was suppressed, namely its statistical economic evidence, contradicts those allegations. See Am. Compl. § III.B.
To demonstrate that CDOR was suppressed, Plaintiff compares it to another benchmark, the Canadian Prime Corporate Paper Rate ("CPCPR") which "measures the cost for corporations with the highest credit rating ... to borrow Canadian dollars on an unsecured basis for between one and three months." Am. Compl. ¶ 322. Plaintiff alleges that the two benchmarks should closely track each "absent manipulation because the cost of borrowing Canadian dollars through commercial paper transactions should be very close to the rate at which Defendants offer to lend Canadian dollars." Id. ¶ 323.[23] Beginning in 2007, Plaintiff alleges that CDOR was suppressed *706 because the chart comparing the two demonstrates that CDOR was lower than CPCPR. Id. ¶¶ 324 fig.9, 325. Plaintiff's chart, however, demonstrates that CDOR was visibly higher than CPCPR in 2014 and the four years prior. Id. In other words, Plaintiff's own evidence suggests that Plaintiff was helped, and not harmed, by Defendants' alleged manipulation. Therefore, even construing the facts in the light most favorable to Plaintiff and assuming the benchmarks are comparable, the evidence Plaintiff puts forth does not support the finding of an antitrust injury. See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A. , No. 16 Civ. 5263, 2017 WL 3600425, at *11 (S.D.N.Y. Aug. 18, 2017) (finding that "economic evidence" comparing two benchmark rates did not support an inference of the existence of an antitrust conspiracy).
The Court is not persuaded by Plaintiff's arguments to the contrary. First, Plaintiff argues that "the fact that one tenor of CDOR may have been higher than comparable rates for portions of the Class Period does not undermine Plaintiff's allegations that CDOR remained artificially lower than it should have been throughout the Class Period." Pl. Opp. at 18. However, because Plaintiff's pre-2014 injuries are time barred, the only evidence Plaintiff puts forth in support of its claim that CDOR was suppressed is the chart, which demonstrates that CDOR was higher than the comparable rate for this tenor. This evidence undermines the complaint's two conclusory allegations that CDOR remained artificially low throughout the Class Period. Am. Compl. ¶¶ 399, 480. Accordingly, Plaintiff's factual allegations fail to "raise a right to relief above the speculative level." Twombly , 550 U.S. at 555, 127 S.Ct. 1955.
Plaintiff further argues that "[h]ow long Defendants' conspiracy caused CDOR to remain artificial" is a question of fact to be resolved at a later stage. Pl. Opp. at 18. The Court disagrees because the complaint does not plausibly allege that CDOR remained artificially low. See Commodity Exch., Inc. , 213 F.Supp.3d at 660 n.24 (plaintiffs failed to "plausibly plead the existence of an antitrust conspiracy prior to 2006 or after 2012 ... [b]ecause most of Plaintiffs' compelling facts, including those based on statistical analyses, are drawn from 2006 through 2012.").[24] As discussed above, not only does Plaintiff's statistical economic evidence fail to support Plaintiff's assertion that CDOR was suppressed, it directly contradicts it.[25]
*707 Next, Plaintiff appears to argue that it is not required to provide proof of harm because this is a per se violation and, therefore, Plaintiff is only required to plead a "warping of market factors" to allege an antitrust injury. Pl. Opp. at 16-17 n.7. To support its argument, Plaintiff cites Gelboim , 823 F.3d at 772-75, but that case did not concern whether a plaintiff can assert an antitrust injury if it has not suffered a loss.[26] At issue in Gelboim was whether plaintiffs could establish an injury given that "[they] remained free to negotiate the interest rates attached to particular financial instruments." Id. at 773. In other words, the court was addressing whether the plaintiff could assert an antitrust injury, even though "the price-fixing conspiracy was not solely responsible for the increased prices." Id. at 774. However, whether plaintiffs suffered a loss was not at issue in Gelboim , as it is here. Id. at 774 ("[T]he anticompetitive effect of the Banks' alleged conspiracy would be that consumers got less for their money.") (emphasis added). Indeed, the Court concluded that "[a]ppellants have plausibly alleged antitrust injury. They have identified an illegal anticompetitive practice (horizontal price-fixing), have claimed an actual injury placing appellants in a worse position as a consequence of the Banks' conduct, and have demonstrated that their injury is one the antitrust laws were designed to protect." Id. at 775 (internal quotation marks and citation omitted) (emphasis added). Here, Plaintiff fails to plausibly allege that it was put in a worse position. Plaintiff, therefore, has not adequately pleaded an antitrust injury and lacks antitrust standing. Accordingly, Defendants' motion to dismiss Plaintiff's antitrust claim is GRANTED.[27]
B. RICO Claim
Defendants assert that Plaintiff's RICO claim should be dismissed because (1) it is partially time barred, (2) it is impermissibly extraterritorial, (3) Plaintiff fails to allege the essential elements, and (4) Plaintiff lacks standing to bring its RICO claim. Def. Mem. at 31-34, 41.
1. Statute of Limitations
"RICO claims are subject to a four-year statute of limitations." Koch, 699 F.3d at 148. The statute of limitations for RICO claims begins to run when a plaintiff is placed on inquiry notice. See id. at 150-51 (statute of limitations for RICO claims "does not begin to run" until a plaintiff has "actual or inquiry notice of the injury").[28]
*708 "Inquiry notice ... gives rise to a duty of inquiry when the circumstances would suggest to an investor of ordinary intelligence that she has been defrauded." Id. at 151 (internal quotation marks and citation omitted). "[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred." Id. at 153. "Such storm warnings ... need not detail every aspect of the alleged fraudulent scheme. Rather, such storm warnings are sufficient where, a person of ordinary intelligence would consider it probable that fraud had occurred. Id. at 151 (internal quotation marks and citation omitted). "An objective standard applies to inquiry notice, and the Court may determine whether plaintiffs were on notice as a matter of law." In re London Silver Fixing, Ltd., Antitrust Litig. , 332 F.Supp.3d 885, 913 (S.D.N.Y. 2018). Plaintiff does not allege that it made any inquiry into its injury prior to the filing of the complaint on January 12, 2018, instead alleging that it "could not have discovered [Defendants' unlawful and self-concealing manipulative acts] by exercise of due diligence." See Am. Compl. ¶ 425.
Defendants allege that Plaintiff was put on inquiry notice in 2007, when the divergent benchmark rates upon which Plaintiff bases its economic analysis were published. Def. Mem. at 38. Alternatively, Defendants argue that Plaintiff was put on inquiry notice in 2011 when IIROC announced that it would review the CDOR rate-setting process, or at the very latest, in January 2013 when IIROC released a report identifying a conflict of interest in the CDOR rate-setting process and recommending that regulations "be implemented to control the rate-setting process to prevent manipulation." Id. at 38-39 (quoting Am. Compl. ¶¶ 261, 263).
Raw data has been found to be insufficient to put a plaintiff on inquiry notice, see, e.g. , Sullivan , 2017 WL 685570, at *27 ; Foreign Exch. Benchmark Rates Antitrust Litig. , 2016 WL 5108131, at *16, but it is still relevant when viewed in combination with other sources of notice, see In re LIBOR-Based Fin. Instruments Antitrust Litig. , 935 F.Supp.2d 666, 708 (S.D.N.Y. 2013) (noting that LIBOR and each bank's LIBOR submissions, along with other benchmarks, were publicly available on a daily basis), vacated on other grounds, Gelboim , 823 F.3d 759. Although some courts have held that public reports of misconduct are sufficient to put a plaintiff on inquiry notice, others have found such reports to be insufficient. Compare 7 W. 57th St. Realty Co., LLC, 2015 WL 1514539, at *21 (Wall Street Journal analysis of erratic behavior of benchmark put the plaintiff on inquiry notice) with London Silver Fixing, Ltd., Antitrust Litig. , 332 F.Supp.3d at 913-16 (news articles and press releases about investigations of misconduct of silver market did not put the plaintiff on inquiry notice) and Foreign Exch. Benchmark Rates Antitrust Litig. , 2016 WL 5108131, at *27 (Bloomberg article about manipulation in foreign exchange market did not put the plaintiff on inquiry notice). In those cases, however, the plaintiffs because aware of the misconduct through other sources like news reports, regulatory settlements, and chats that became available after the limitations period ran. See, e.g., id. ECF No. 619 ¶¶ 381-393; Sullivan , 2017 WL 685570, at *26. In contrast, Plaintiff here relies solely on its economic analysis and the IIROC report, see generally Am. Compl., which has been available since January 2013 at the latest, id. ¶ 261; see also Woori Bank v. Merrill Lynch , 923 F.Supp.2d 491, 497 (S.D.N.Y. 2013) ("If [plaintiff] claims that this extensive publicly available information cited in its complaint supports its claims, then *709 these public materials would also have contributed to the totality of the circumstances putting the bank on notice of possible claims.") aff'd , 542 F. App'x 81 (2d Cir. 2013). Moreover, Plaintiff provides no explanation for why the evidence it relies on was insufficient to put it on inquiry notice in 2013, but sufficient to file a lawsuit in 2018. The court, therefore, finds that although neither the availability of the data underlying Plaintiff's economic analysis in 2007, nor the IIROC's announcement of its review in 2011, were sufficient to put Plaintiff on inquiry notice, this information, in combination with the IIROC's findings in January 2013, constituted sufficient "storm warnings" to put Plaintiff on inquiry notice.
Defendants argue that Plaintiff's RICO claim is time barred to the extent that it is based on conduct that occurred before January 12, 2014 (four years before the lawsuit was filed). Def. Mem. at 41. Having found that Plaintiff was put on inquiry notice in January 2013, and because RICO claims have a four-year statute of limitations, the Court agrees. Accordingly, Plaintiff's RICO claim is dismissed to the extent that it is based on conduct that occurred before January 12, 2014.[29]
2. Extraterritorial
Defendants next argue that Plaintiff's RICO claim is impermissibly extraterritorial. Def. Mem. at 31-31. The Court agrees.
"When a statute gives no clear indication of an extraterritorial application, it has none." Morrison v. Nat'l Austrl. Bank Ltd. , 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). "Congress's incorporation of ... extraterritorial predicates into RICO gives a clear, affirmative indication that § 1962 applies to foreign racketeering activity-but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." RJR Nabisco, Inc. v. European Cmty. , --- U.S. ----, 136 S.Ct. 2090, 2102, 195 L.Ed.2d 476 (2016). "Accordingly, a RICO claim may be based on foreign racketeering activity only if its predicate acts apply extraterritorially." Sonterra , 277 F.Supp.3d at 580. Plaintiff's RICO claim is based on predicate acts of wire fraud, which does not apply extraterritorially. See Petroleos Mexicanos v. SK Eng'g & Constr. Co. , 572 F. App'x 60, 61 (2d Cir. 2014) ("[W]ire fraud cannot serve as ... an extraterritorial predicate.").
To state a RICO claim predicated on wire fraud, Plaintiff must allege "sufficient domestic conduct for the claims involving ... wire fraud ... to sustain the application of RICO." Laydon v. Mizuho Bank, Ltd. , 2015 WL 1515487, at *8 (S.D.N.Y. March 31, 2015) (quoting European Community v. RJR Nabisco , 764 F.3d 129, 141 (2d Cir. 2014) ). "[S]imply alleging that some domestic conduct occurred cannot support a claim of domestic application," Norex Petroleum Ltd. v. Access Indus., Inc. , 631 F.3d 29, 33 (2d Cir. 2010), because "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case," Morrison , 561 U.S. at 266, 130 S.Ct. 2869. Here, Plaintiff alleges that Defendants used wires to (1) submit rates to Thomson Reuters, which then transmitted the daily rate throughout the United States, (2) trade CDOR-Based Derivatives with U.S. counterparties and on U.S. exchanges without disclosing that they were simultaneously suppressing *710 CDOR, and (3) send trade confirmations based on manipulated and false CDOR rates to counterparties within the United States. Am. Compl. ¶ 469.
Other courts in this District have found RICO claims to be impermissibly extraterritorial in cases involving alleged manipulation of foreign market interest rate benchmarks with similar domestic wire fraud allegations. See, e.g., Sonterra , 277 F.Supp.3d at 580-83 ; FrontPoint , 2017 WL 3600425, at *14-15 ; Sullivan , 2017 WL 685570, at *33-34. In Sonterra , for example, the plaintiffs alleged that the defendants manipulated the Swiss franc London Interbank Offered Rate ("CHF LIBOR") by making false submissions and that the plaintiffs were "on the losing end of that manipulation, transacting in Swiss franc derivatives with defendants and third parties ... on terms made less favorable" by the defendants' actions. 277 F.Supp.3d at 535, 539. The "alleged U.S. connections included transmitting false quotes through servers located in the United States, causing Thomson Reuters and the BBA to publish manipulated LIBOR fixes into the United States, coordinating their derivative positions with their LIBOR submissions in electronic chat rooms through servers located in the United States, and sending trade confirmations based on manipulated LIBOR rates to counterparties in the United States." Id. at 581. The court dismissed plaintiffs' RICO claims as extraterritorial because "defendants [were] based abroad, their allegedly manipulated quotes were submitted from abroad to a banking association located abroad, and the LIBOR rate at issue is the LIBOR rate for a foreign currency." Id. at 582. Here too, the CDOR rates were submitted from abroad to Thomson Reuters, which is located in Canada, and the CDOR rate at issue is the CDOR rate for a foreign currency-the Canadian dollar. Am. Compl. ¶¶ 3, 27.[30] Moreover, Plaintiff's allegations regarding Defendants' U.S. connections are substantially similar to those in Sonterra and the other cases finding RICO claims to be impermissibly extraterritorial. Because Plaintiff's RICO claim is impermissibly extraterritorial, Defendants' motion to dismiss Plaintiff's RICO claim is GRANTED.[31]
C. CEA Claim
Defendants assert that Plaintiff's CEA claims should be dismissed as time-barred. Def. Mem. at 37. The Court agrees.
CEA claims are subject to a two-year statute of limitations. London Silver Fixing, Ltd. Antitrust Litig. , 332 F.Supp.3d at 912. As with Plaintiff's RICO claim, the statute of limitations for CEA claims begins to run when a plaintiff is placed on inquiry notice of its injury. See id.[32] As previously discussed, Plaintiff was put on inquiry notice in January 2013. Accordingly, because Plaintiff was put on inquiry notice in January 2013, but did not file its complaint until January 12, 2018, the Court holds that Plaintiff's CEA claims are DISMISSED as time-barred.[33]
*711 D. State Law Claims
Having dismissed Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c). See Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. , 712 F.3d 705, 727 (2d Cir. 2013) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.") (internal quotation marks and citation omitted). Accordingly, Plaintiff's state law claims against Defendants are DISMISSED without prejudice to renewal in state court.
CONCLUSION
For the reasons stated above, Foreign Defendants' motion to dismiss for lack of personal jurisdiction is GRANTED and Defendants' motion to dismiss is GRANTED with respect to Plaintiff's Sherman Act, CEA, and RICO claims. Plaintiff's state law claims are dismissed without prejudice to renewal in state court.
The Clerk of Court is directed to terminate the motion at ECF No. 113 and close the case.
SO ORDERED.

"Defendants" include the Bank of Montreal. BMO Financial Corp., BMO Nesbitt Burns Inc., BMO Capital Markets Corp., Bank of America Corporation. Bank of America N.A., Merrill Lynch. Pierce, Fenner & Smith Incorporated, Merrill Lynch Canada Inc., Deutsche Bank AG, Deutsche Bank Securities Limited, The Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Capital Inc., Canadian Imperial Bank of Commerce, CIBC World Markets Corp., CIBC World Markets, Inc., HSBC Holdings plc, HSBC Bank plc, HSBC North American Holdings Inc., HSBC Securities (USA) Inc., HSBC Bank Canada, HSBC Bank U.S.A., N.A., HSBC USA Inc., National Bank of Canada, National Bank Financial Inc., Royal Bank of Canada, RBC Dominion Securities Inc., RBC Capital Markets, LLC, Toronto-Dominion Bank, TD Securities Inc., and TD Securities (USA) LLC.

The Foreign Defendants refer to the following entities: Bank of Montreal, BMO Nesbitt Burns Inc., Canadian Imperial Bank of Commerce, CIBC World Markets Inc., Deutsche Bank AG, Deutsche Bank Securities Limited, HSBC Holdings plc, HSBC Bank plc, HSBC Bank Canada, Merrill Lynch Canada Inc., National Bank of Canada, National Bank Financial Inc., Royal Bank of Canada, RBC Dominion Securities, The Bank of Nova Scotia, Scotia Capital, Inc., Toronto-Dominion Bank, and TD Securities Inc.

The CDOR was formally referred to as the Canadian Dealer Offered Rate. Am. Compl. ¶ 265.

The complaint does not explicitly define the CDOR Panel, but it alleges that the CDOR Panel is responsible for setting the CDOR through its submissions. Am. Compl. ¶ 269.

The following Defendants served on the CDOR Panel during the Class Period: Bank of Montreal, the Bank of Nova Scotia, CIBC Bank, National Bank of Canada, Royal Bank of Canada, Toronto-Dominion Bank, HSBC Bank Canada, Merrill Lynch Canada Inc., Deutsche Bank AG, BMO Nesbitt Burns, Scotia Capital Inc., CIBC World Markets, Inc., National Bank Financial, Inc., Deutsche Bank Securities Ltd., RBC Dominion Securities Inc., and TD Securities Inc. Am. Compl. ¶ 248.

Bankers' Acceptances are a type of money market instrument that function like a check where a bank "agrees to pay a specified amount of money-known as the BA's 'face value'-to the bearer on a certain future maturity date." Am. Compl. ¶ 250.

The "number of days between when a BA is issued and when it matures" determines its tenor. Am. Compl. ¶ 362. "[A] BA that matures in 90 days has a three-month tenor, while one maturing in 180 days has a six-month tenor." Id.

The complaint does not allege where BMO Nesbitt Burns Inc., Scotia Capital Inc. or the National Bank Financial, Inc. are located. However, Foreign Defendants' declarations establish that they are Canadian companies. See Taves Decl. ¶ 4, ECF No. 116 (BMO Nesbitt Burns Inc. "is a Canadian company that is incorporated in Canada"); Davis Decl. ¶ 3, ECF No. 127 (National Bank Financial, Inc. "is a Canadian corporation organized and existing under the laws of Canada"); Haskins Decl. ¶ 2, ECF No. 130 (Scotia Capital Inc. "is a Canadian investment dealer" with its headquarters in Canada). Because Plaintiff's complaint fails to allege where these banks are located, and Plaintiff otherwise does not dispute Defendants' assertions, the Court accepts Defendants' assertions as true for purposes of this motion.

This statement is supported by Foreign Defendants' sworn affidavits and Plaintiff does not contest it. See Taves Decl. BMO ¶¶ 13-15, ECF No. 115 (Bank of Montreal); Taves Decl. ¶¶ 13-15 (BMO Nesbitt Burns); Nilsson Decl. ¶ 5, ECF No. 129 (Bank of Nova Scotia); Matthews Decl. ¶ 8, ECF No. 117 (Canadian Imperial Bank of Commerce); Girouard Decl. ¶ 7, ECF No. 126 (National Bank of Canada); Serritella Decl. ¶ 8, ECF No. 128 (Royal Bank of Canada and RBC Dominion Securities); Jungreis Decl. ¶ 11, ECF No. 131 (Toronto-Dominion Bank and TD Securities Inc.); Henderson Decl. ¶ 6, ECF No. 124 (HSBC Bank Canada); Trasolini Decl. ¶ 9, ECF No. 125 (Merrill Lynch Canada); Haskins Decl. ¶¶ 2-3 (Scotia Capital Inc.); Davis Decl. ¶¶ 7-8, ECF No. 127 (National Bank Financial Inc.); Gynn Decl. ¶ 10, ECF No. 120 (Deutsche Bank Securities Ltd. and Deutsche Bank AG).

In a footnote, Plaintiff argues that certain Foreign Defendants consented to general jurisdiction in New York by registering under N.Y. Banking Law § 200 and appointing the "Superintendent of the New York State Department of Financial Services as their agent for service of process." Pl. P.J. Opp. at 18 n.16. Plaintiff is incorrect. See In re Foreign Exch. Benchmark Rates Antitrust Litig. , 2016 WL 1268267, at *2 (collecting cases rejecting this argument). Because this is Plaintiff's sole basis for claiming general jurisdiction, the Court will only consider specific jurisdiction.

The Court notes that the Second Circuit has interpreted 15 U.S.C. § 22, the Clayton Act's service provision, to allow nationwide service of process "only in cases in which its venue provision is satisfied." Daniel v. Am. Bd. of Emergency Med. , 428 F.3d 408, 423 (2d Cir. 2005). This logic applies in equal force to the CEA's service provision as it contains the same operative language the Second Circuit relied on in Daniels . See 7 U.S.C. § 25(c). However, "[n]o party has addressed the relationship between the venue provision and the service of process provision, and defendants have not challenged this District's venue. Accordingly, this Court considers whether plaintiffs have made a prima facie showing that defendants' national contacts are sufficient for this Court to exercise personal jurisdiction." Sullivan , 2017 WL 685570, at *42.

See, e.g. , Pl. P.J. Opp. at 8 ("Defendants' sales of price-fixed derivatives are 'related to' Plaintiff's antitrust claims because a plaintiff must transact in the restrained market to have an antitrust injury."); Id. ("PJ Defendants' sales of manipulated CDOR-Based Derivatives in the forum constitute domestic wire fraud violations ... which caused Plaintiff to suffer domestic RICO injuries when it was forced to overpay in these transactions."); Id. (Plaintiff suffered actual damages under the CEA when Foreign Defendants sold price-fixed CDOR-Based Derivatives to Plaintiff.").

The Dennis court found that the conspiracy alleged in Schwab was financially motivated because, in addition to its reputation-based goal, it was also undertaken because "[s]uppressing LIBOR ... had the immediate effect of lowering Defendants' interest payment obligations on financial instruments tied to LIBOR.'" 343 F.Supp.3d at 205 (quoting Schwab , 883 F.3d at 78 ).

Additionally, the complaint in this case is weaker than those in other cases where courts have found a profit-motive to be adequately alleged. For example, in FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A. , the Monetary Authority of Singapore found "attempts [by traders] to inappropriately influence benchmark submissions," and specifically, that "133 traders [participated] in attempts to inappropriately influence the submissions of financial benchmarks" during the class period. 2018 WL 4830087, at *3. The Court explicitly relied on this finding to conclude that the complaint "sufficiently raise[d] the specter of common motive to conspire." Id. Here, the IIROC made no findings of wrongdoing. Am. Compl. ¶ 261. Additionally, the alleged conspiracy in FrontPoint did not require that the banks all maintain the same position (net short or net long) throughout the class period to profit. Id. at *2.

Plaintiff alleges that the chart refers to the CDOR-Based Loans and CDOR-Based Derivatives held by seven Defendants. ¶ 308.

See, e.g. , Am. Compl. ¶ 118 ("Defendant HSBC Securities (USA) Inc. [...] is a subsidiary of HNAH. It is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and a registered Futures Commission Merchant with the CFTC. Defendant HSUSA trades interest rate derivatives, futures, options, and FX forwards, including CDOR-Based Derivatives, from within the United States.").

The cases Plaintiff cites to support its argument are irrelevant as the courts in those cases specifically found that the U.S.-based transactions were related to the conspiracy because the conspiracy was profit-motivated. See, e.g. , Nypl v. JPMorgan Chase & Co , No. 15 Civ. 9300, 2018 WL 1472506, at *5 (S.D.N.Y. May 22, 2018) ; Sonterra , 277 F.Supp.3d at 591-92. As noted above, here Plaintiff fails to allege such a profit-motivated conspiracy.

Because Plaintiff has failed to establish that sales of CDOR-Based Derivatives in the United States constitute minimum contacts, the Court does not need to separately analyze whether the sale of CDOR-Based Derivatives in New York constitute minimum contacts for the RICO claim as New York is within the United States.

Having found that Plaintiff has not established adequate minimum contacts, the Court does not reach the question of whether the exercise of personal jurisdiction comports with fair play and substantial justice.

Plaintiff brings claims against Bank of America, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch Canada Inc. (which it refers to collectively as BOA). Am. Compl. ¶¶ 213-226. Of those Defendants, Merrill Lynch Canada is the only one who was a member of the CDOR Panel. Id. ¶ 225.

Plaintiff makes conclusory allegations that Defendants "regularly met in person at industry conferences," but the only specific examples it provides are from 2008 and 2009, and it does not allege that Bank of America, or any of its subsidiaries, attended these conferences. Am. Compl. ¶¶ 363-364.

A foreign exchange forward "is a derivative that provides for the purchase or sale of one currency (e.g., CAD) in terms of another (e.g., USD) on some future date (e.g., 90 days from now), at a price agreed upon today." Am. Compl. ¶ 289.

Plaintiff also compared CDOR to another benchmark, Adjusted CAD LIBOR, which the Court does not consider with respect to the antitrust injury because it was discontinued in 2013, see Am. Compl. § III.A, and Plaintiff is time barred from asserting an antitrust claim based on injuries that occurred prior to 2014.

[Missing text.]

Moreover, the cases Plaintiff cites to support this argument are distinguishable. Plaintiffs in London Silver Fixing, Ltd., Antitrust Litig. , claimed that the defendants' manipulation of the silver market caused downward price movements to persist throughout the trading day. 213 F.Supp.3d at 544. Defendants argued that this claim of "persistence" failed because one of Plaintiffs' experts took the position that the downward swings may have been part of a short-term trading strategy. Id. at n.9 (emphasis added). The Court rejected this argument as raising a question of fact that could not be resolved at the pleading stage. Id. Here, rather than having contradictory evidence that demonstrates both that CDOR was suppressed and that it was not, the only evidence Plaintiff puts forth in support of its claims shows that it was not suppressed. Plaintiff also relies on Schwab for the proposition that the Court cannot rule out Plaintiff's allegation of injury at the pleading stage based on Defendants' contrary interpretation of economic evidence. Pl. Opp. at 18. However, after declining to "rule out either theory of loss causation," the Second Circuit in Schwab went on to state that the complaint must give "some indication of a plausible casual link between the loss and the alleged fraud." Schwab , 883 F.3d at 93 (internal quotation marks and citation omitted). Plaintiff has failed to establish a plausible causal link because its own economic evidence demonstrates that CDOR was not suppressed. Finally, Plaintiff cites In re Foreign Exch. Benchmark Rates Antitrust Litig. , for the argument that "[q]uestions as to ... the conspiracy's scope may be raised later in litigation, but do not merit dismissal." Pl. Opp. at 18 (quoting In re Foreign Exch. Benchmark Rates Antitrust Litig. , No. 13 Civ. 7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016). However, the court had already concluded that the complaint plausibly alleged a conspiracy and that statement was referring to questions about each individual defendant's participation in that conspiracy. Id. Here, the Court is merely concluding that Plaintiff failed to adequately plead an injury. See In re LIBOR-Based Fin. Instruments Antitrust Litig. , 962 F.Supp.2d 606, 623 (S.D.N.Y. 2013) (rejecting augment that alleged "manipulation was so constant that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period" where allegations indicated that manipulation occurred less than 20% of the time over a four-year period).

Plaintiff arguably acknowledges this. See Pl. Opp. at 16 (Gelboim held "that antitrust injury was sufficiently alleged where plaintiff pleaded that it lost money on LIBOR-based instruments due to defendants' suppression of LIBOR.") (emphasis added).

Having found that Plaintiff lacks standing to bring its antitrust claim, the Court shall not address the rest of Defendants' arguments with respect to this claim.

As previously discussed, the statute of limitations was not tolled under the fraudulent concealment doctrine.

For the reasons stated above, Plaintiff's RICO claim against Bank of America and its subsidiaries are fully time barred.

The Amended Complaint does not state where Thomson Reuters is located, but Foreign Defendants' sworn affidavits support the statement that Thomson Reuters is located in Canada, see, e.g. , Taves Decl. ¶ 12, and Plaintiff does not contest this.

Having dismissed the RICO claim in its entirety, the Court does not reach the remainder of Defendants' arguments with respect to RICO.

As previously discussed, the statute of limitations was not tolled under the doctrine of fraudulent concealment.

Having determined that Plaintiff's CEA claims are time barred, the Court does not reach the remainder of Defendants' arguments.